UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

RANDAL TOCA,

      Petitioner,

v.

Case No. 2:23-cv-303-KCD

DEBONAIR PROPERTIES LLC,
TED HOBSON,

      Claimants.
_____/

## ORDER

This maritime case stems from a collision between two vessels in the Fort Myers Yacht Basin during Hurricane Ian. (*See* Doc. 1 ¶¶ 11-12.)[1] The vessel Madame Musique became loose from its mooring and struck Knot Speed, which was secured to the adjacent dock. Madam Musique's owner—Petitioner Randal Toca—seeks "exoneration from liability" under the Shipowner's Limitation of Liability Act. (*Id.* ¶ 28.) He now moves for summary judgment, claiming "the undisputed record evidence establishes [he] is free from negligence and is entitled to exoneration as a matter of law." (Doc. 72 at 2.) He also moves to exclude Claimants' maritime expert under *Daubert v. Merrell Dow Pharms.,*

---

[1] Unless otherwise indicated, all internal quotation marks, citations, case history, and alterations have been omitted in this and later citations.

*Inc.*, 509 U.S. 579 (1993). (Doc. 73.) For the reasons below, both motions are **DENIED**.

## I. Background

The following facts are undisputed unless otherwise noted. As Hurricane Ian approached Southwest Florida, Knot Speed's owner—Claimant Ted Hobson—reserved a slip in the yacht basin and secured his ship. At the same time, Madame Musique was undergoing repairs on Gasparilla Island. (Doc. 1 ¶ 13.) Toca was also aware of the storm, so he reserved a slip near Lake Okeechobee and hired a crew to take it there. Captain Daniel Tamm would pilot the boat, along with engineers Robert Burich and Tristian Long. (*Id.* ¶¶ 14-15.)

But Madame Musique never reached its destination. Although Toca sent Captain Tamm to Florida five days before the hurricane, he did not arrive until the night of September 26, less than two days before landfall. (*See* Doc. 72-2 at 54:9-14, 55:7-9.) Making matters worse, the tides were too low for the crew to leave the marina the next morning. (*See* Doc. 72-5 at 14:20-25, 15:1-9.) As a result, Madame Musique did not depart Gasparilla Island until the afternoon of September 27. (*Id.*)

To reach Lake Okeechobee, the crew proceeded up the Caloosahatchee River. Shortly after passing Fort Myers, they found their path blocked by an unattended railroad bridge. Unable to continue upriver, the crew searched for

alternatives, ultimately deciding to return to Fort Myers and the yacht basin where Knot Speed was moored.

When they arrived, the crew found plenty of space on B dock. (Doc. 72-5 at 70:5-8.) According to the yacht basin's Dockmaster, Mary Grace VanVliet, that's because B dock had been cleared in anticipation of Ian's arrival. (*See* Doc. 72-6 at 24:1-4; Doc. 72-11 at 30; Doc. 74-15.) It was the yacht basin's most exposed dock, setting the boundary between the marina and the Caloosahatchee River. It also had shorter pilings and only allowed for parallel parking, meaning vessels could only secure themselves along one side. (*See* Doc. 72 at 8; Doc. 72-6 at 31:21-25.)

Working within the dock's structural limitations, the crew—under Toca and Captain Tamm's instruction—secured Madame Musique with "as many lines as possible": two lines from the front, two from the middle, and one from the rear. (Doc. 72-4 at 23:20-25, 24:1-24.) Although Captain Tamm thought the lines were secured and he would not have done anything differently, (Doc. 72-2 at 25:20-25), he acknowledges that the ultimate success of this configuration depended on the strength of the concrete piling to which the center lines were tied, (*id.* at 16:20-25, 17:1-3).

The next afternoon, Hurricane Ian arrived in earnest. As the storm intensified, a one-hundred-foot ship, which had been moored to Madame Musique's outside, pulled away, exposing it to the brunt of the wind and waves.

3

(Doc. 72-3 at 8.) As a result, Madame Musique began to yo-yo between the dock and the limits of its lines. (Doc. 72-4 at 30:23-25, 31:1-14.) As it snapped back to the dock, Madame Musique pounded the concrete piling to which its middle lines were attached. It did this forty times or so before the crew heard a loud crack, indicating that the hull had been breached, and the ship began taking on water. (Doc. 72-4 at 31:6-25.) Then, the concrete piling to which the middle lines were tied gave out. (*Id.*) Suddenly, three lines—those extending from its front and rear—were all that was holding Madame Musique to the dock. (Doc. 72-2 at 16:20-17:3.) Taking on water and hardly moored, the crew abandoned ship.

The remaining lines did not hold for long. Shortly after the crew left, Madame Musique was on the loose and drifting towards Knot Speed.

Each member of Madame Musique's crew believes the Knot Speed sank before the collision. (*See* Doc. 72-2 at 40:3-25, 41:1-7, 43:10-16, 51:19-25, 52:1-4; Doc. 72-4 at 43:1-18, 52:10-19; Doc. 72-5 at 35:4-25.) Yet none appear to have seen the boats collide, nor do they know when the Knot Speed breached its hull. Instead, it appears they've each deduced that Knot Speed had already sunk based on how it sits in a handful of still-frame photographs. (*Id.*)

Hobson (Knot Speed's owner) disagrees. He questions whether the crew—who spent much of the night concerned with the viability of their own ship, before plunging into raging waters to save their own lives—were able to

judge the viability of Knot Speed. What is more, Hobson suggests the crewmembers' uniform deductions may result from an effort to create a single story that minimizes their role in Knot Speed's demise.

Hobson is not alone in believing Madame Musique destroyed Knot Speed. Ken Winchester witnessed the collision, and he offers a different version of events. (Doc. 72-7 at 54:19-24.) Unlike Madame Musique's crew, who were docked across the yacht basin, Winchester was familiar with Knot Speed and had the opportunity to see it throughout the day. (*Id.* at 26:1-25.) According to him, the ship was "rocking back and forth" in the surf and knocking the pylons that lined its slip, like "almost every [other] boat" in the yacht basin. (*Id.* at 25:18-26:21.) But it didn't appear to be impaled before colliding with Madame Musique. (*Id.* at 26:5-8, 53:15-17.) In fact, Winchester did not witness any notable damage to Knot Speed before the collision. (*Id.* at 54:13-18.) Later that night, however, Winchester watched as Madame Musique slid alongside Knot Speed, "pinned it against [a] piling," and began to smash it "wildly." (*Id.* at 27:22-28:15.) This lasted for "[m]ost of the evening," (*id.* at 28:17-18, 46:19-21), and "made so much noise" that Winchester could hear tearing fiberglass over the storm, (*id.* at 28:1-5).

Regardless of whether Knot Speed suffered catastrophic damage and began to sink before the collision, or only did so because of its contact with Madame Musique, one thing is undisputed: when the storm passed, Knot

5

Speed was destroyed and Madame Musique lay atop it. (*See* Doc. 73-1 at 4-5.) Because it is unclear how this came to be, the parties each hired experts to opine on the cause and timing of Knot Speed's demise.

Toca retained David Morris, who surveyed Knot Speed, Madame Musique, and the Fort Myers Yacht Basin. (*See* Doc. 72-3.) He also interviewed Hobson, Winchester, Madame Musique's crew, and several witnesses. (*Id.*) Having considered this evidence, in addition to photographs taken during the storm, Morris concluded that the Knot Speed had become "partially submerged" before its allision with Madame Musique, when several dock pilings penetrated its hull. (*Id.* at 28-29.)

Hobson retained George M. Zeitler, a retired Coast Guardsman who spent most of his service conducting "commercial vessel safety inspections and casualty investigations." (Doc. 73-1 at 1.) He rejects Toca's theory of the case. (*See* Docs. 73-1, 73-2.) Zeitler inspected Knot Speed, the Yacht Basin, and reviewed the documentary evidence. He concluded that Madame Musique "was not adequately moored," and as a result, it broke free from the dock, drifted across the yacht basin, and hit Knot Speed. (Doc. 73-1 at 8-9.) According to him, the force of the collision, "combined with the prevailing winds and storm surge," pressed Madame Musique against Knot Speed and caused it to "heel over" atop "multiple wood pilings," which "penetrated [its] hull" and ultimately caused it to sink. (*Id.* at 9.)

As mentioned, Toca moves to exclude Zeitler's testimony. (*See* Doc. 73.) As best the Court can tell, he does not object to Zeitler's credentials or the inspection performed. (*See* Doc. 73 at 1-2.) Nor does he directly attack the reasoning Zeitler applied in reaching his conclusions. Instead, Toca contends that Zeitler's opinions are unreliable because he failed to interview "a single eyewitness to the events in question." (*Id.*)

As for Toca's summary judgment motion, he argues that Claimants cannot show that Madame Musique caused Knot Speed actionable damage. This is because "the undisputed material facts" show that Knot Speed was damaged and "partially submerged well before the Madame Musique broke free from its moorings." (Doc. 72 at 13.) But even if Claimants can meet their burden on damages, Toca still believes he is entitled to summary judgment because any collision between the ships resulted from an act of God, not negligence. (*Id.*)

## II. Legal Standard

Separate standards govern the motions before the Court. Beginning with Toca's *Daubert* motion, Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. *Otogenetics, Corp. v. Omega Biosciences, Inc.*, No. 1:15-CV-2697-SCJ, 2017 WL 11580438, at *3 (N.D. Ga. Aug. 7, 2017). It permits an expert to testify if the moving party can show that the expert is "qualified to testify competently regarding the matter" they intend to address,

7

their methodology is "reliable as determined by a *Daubert* inquiry," and their testimony will "assist the trier of fact through the application of expertise to understand the evidence or determine a fact in issue." *Castang v. Kim*, No. 1:22-CV-5136-SCJ, 2023 WL 2370961, at *1 (N.D. Ga. Feb. 2, 2023). The party offering the expert must satisfy these requirements by a preponderance of the evidence. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005).

"In determining the admissibility of expert testimony under Rule 702, [t]he court serves as a gatekeeper, charged with screening out experts whose methods are untrustworthy or whose expertise is irrelevant to the issue at hand." *Monte v. Sherwin-Williams Dev. Corp.*, No. 6:23-CV-288-JSS-DCI, 2025 WL 90119, at *2 (M.D. Fla. Jan. 14, 2025). This remains true even where the case is proceeding as a bench trial, as here. *Leger v. Carnival Corp.*, No. 1:24-CV-21364, 2025 WL 1295042, at *3 (S.D. Fla. Feb. 25, 2025). The court "enjoy[s] extremely broad discretion" in deciding whether to admit expert testimony in this circumstance, *FCOA, LLC v. Foremost Title & Escrow Servs., LLC*, No. 17-23971-CIV, 2019 WL 387294, at *5 (S.D. Fla. Jan. 30, 2019), since "[t]here is less need for the gatekeeper to keep the gate when [he] is keeping the gate only for himself," *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005).

While the standard is more relaxed, the purpose of the Court's inquiry remains the same: determining whether the expert's opinions "are based on

8

reliable methodolog[ies] and principles," not whether they are correct. *Castro v. United States*, No. 2:15-CV-378-FTM-38CM, 2016 WL 5942354, at *4 (M.D. Fla. Oct. 13, 2016). "In other words, challenges to the weight and sufficiency of the expert testimony" are still improper. *Walters v. Altec Indus., Inc.*, No. 3:01-CV-371J12TEM, 2003 WL 25686829, at *3 (M.D. Fla. Sept. 3, 2003).

Turning to Toca's other motion, summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When deciding a motion for summary judgment, a judge "is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). This is true even where, as here, the case is set for a bench trial. *See F.T.C. v. Direct Benefits Grp., LLC*, No. 6:11-CV-1186-ORL-28, 2012 WL 5430989, at *4 (M.D. Fla. Nov. 7, 2012).

"An issue is genuine if a reasonable [factfinder] could return a verdict for the nonmoving party." *Do v. Geico Gen. Ins. Co.*, No. 1:17-CV-23041-JLK, 2019 WL 331295, at *2 (S.D. Fla. Jan. 25, 2019). And a "fact is material if it may affect the outcome of the case under the applicable substantive law." *Id*.

"The moving party bears the initial burden of identifying those portions of the record demonstrating the lack of a genuinely disputed issue of material fact." *Desai v. Navigators Ins. Co.*, 400 F. Supp. 3d 1280, 1287 (M.D. Fla. 2019).

"If the movant does so, the burden then shifts to the non-moving party to demonstrate that there are, in fact, genuine factual disputes which preclude judgment as a matter of law." *Id*. "The assertion that a fact is genuinely disputed. . . must [be] supported by particular parts of materials in the record." *Moore v. Eger,* No. 616CV303ORL28GJK, 2017 WL 6367598, at *2 (M.D. Fla. Oct. 20, 2017). "In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party." *Id*. at *3.

### III. Discussion

#### A. *Daubert* Motion

The Court starts with the *Daubert* factors not in dispute. Toca does not challenge Zeitler's credentials or his experience. Zeitler is a graduate of the United States Coast Guard Academy. He spent twenty years in the service, primarily conducting the kinds of inspections and investigations performed here. He also spent a year "overseeing the pre-storm preparations for vessels in multiple South Florida ports." (Doc. 73-1 at 2.) Upon completing his service, Zeitler continued performing inspections and investigations as a consultant and started teaching courses on related subjects at the Chapman School of Seamanship. Considering these credentials, Zeitler is sufficiently qualified to opine on the matters at hand.

10

Apart from his concerns about the reliability of Zeitler's opinions (addressed below), Toca does not offer any opposition to the helpfulness of Zeitler's testimony. (*See* Doc. 73 at 8-10.) "Expert testimony is helpful to the trier of fact if it concerns matters that are beyond the understanding of the average layperson." *AM Grand Ct. Lakes, LLC v. Rockhill Ins. Co.*, No. 18-CV-23576, 2019 WL 13216296, at *5 (S.D. Fla. Sept. 11, 2019). Among other things, Zeitler intends to offer testimony about his inspection of the Knot Speed and the Fort Myers Yacht Basin, as well as the proper procedures for preparing ships to weather a storm like Hurricane Ian. (*See* Doc. 73-1 at 8-9.) These are all beyond the understanding of the average layperson, and Zeitler's testimony, which will draw on the qualifications and expertise discussed above, will assist the Court in better understanding the evidence and merits. *See Castang*, 2023 WL 2370961, at *1.

That leaves reliability. Toca contends that Zeitler's opinions "lack a sufficient factual foundation," rendering them unreliable, since they were formed "without interviewing any individuals who were actually present when the damage to the Knot Speed occurred." (Doc. 73 at 1-2, 8.) Courts have repeatedly rejected similar arguments. What evidence an expert did, or did not, consider generally affects the weight of their testimony, not its admissibility. *See Kang v. Mayor & Aldermen of City of Savannah*, No. CV421-111, 2024 WL 150082, at *5 (S.D. Ga. Jan. 12, 2024); *Action Nissan, Inc. v. Hyundai Motor*

11

*Am.*, No. 618CV380ORL78EJK, 2020 WL 9173027, at *2 (M.D. Fla. Nov. 5, 2020) ("To the extent that Plaintiffs argue that [the expert's] opinions should be excluded because he failed to consider certain facts or evidence, their attacks go to weight, not admissibility."); *Rollins v. Mr. Heather, Inc.*, No. 1:16-CV-01834-JEO, 2018 WL 11454741, at *6 (N.D. Ala. Sept. 11, 2018) ("The inquiry for the court is merely whether [the expert's] opinion is supported by sufficient, not necessarily all, facts. Any alleged weaknesses in [his] methodology regarding the above goes to the weight of his testimony, not its admissibility.")

In any case, it's unclear that this alleged information gap exists, since Zeitler reviewed (and considered) the summaries of Morris's interviews with the relevant witnesses. (*See* Doc. 73-2.) Toca needed to show that Zeitler's opinions lacked sufficient factual foundation. *See Bowers v. N. Telecom*, 905 F. Supp. 1004, 1007-08 (N.D. Fla. Sept. 25, 1995). He has not done so. Even if Zeitler should have spoken with the witnesses, failing to do so is not enough to exclude his testimony on these facts.

### B. Motion for Summary Judgment

"Admiralty and maritime law includes a host of special rights, duties, rules, and procedures." *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 446 (2001). Among them is the Shipowner's Limitation of Liability Act, which allows a vessel owner to seek "both exoneration from, and limitation of, liability for maritime accidents." *In re Skanska USA Civ. Se. Inc.*, 577 F. Supp. 3d 1302,

12

1313 (N.D. Fla. 2021). As mentioned, Toca seeks summary judgment on his exoneration claim.

Maritime torts are reviewed under a two-step analysis. First, to answer the exoneration question, the court determines what acts of negligence, if any, caused the accident. *Beiswenger Enters. Corp. v. Carletta*, 86 F.3d 1032, 1036 (11th Cir. 1996). Liability is established only where the vessel owner's negligence was a contributory and proximate cause of the accident. If the shipowner is free from any fault, he is exonerated from all liability. *See Am. Dredging Co. v. Lambert*, 81 F.3d 127, 129 (11th Cir. 1996). But if negligence at least partly produced the accident, the court proceeds to the second step, limitation of liability, and determines whether the vessel owner had knowledge of, or was in privity with, the acts of negligence.

Generally, the burden of establishing negligence at this stage would fall on Hobson as the claimant. *See In re Honeycutt*, No. 8:05CV439T27MSS, 2006 WL 2792890, at *4 (M.D. Fla. Sept. 27, 2006). However, when a vessel is "moving or drifting due to an external force, such as the current or the wind," and it "allides with a stationary object, the moving vessel is presumptively at fault." *Fischer v. S/Y Neraida*, 508 F.3d 586, 593 (11th Cir. 2007). This presumption "derives from the common-sense observation that moving vessels do not usually collide with stationary objects unless the moving vessel is

13

mishandled in some way." *Bunge Corp. v. Freeport Marine Repair, Inc.*, 240 F.3d 919, 923 (11th Cir. 2001).

To overcome this presumption, Toca, as the owner of the moving ship, must disprove his fault by a preponderance of the evidence. *Liberty Surplus Ins. Corp. v. Patriot Asphalt, LLC*, No. CIV.A. 06-0456-WSM, 2009 WL 455600, at *2 (S.D. Ala. Feb. 20, 2009); *Union Pac. R. Co. v. Heartland Barge Mgmt., L.L.C.*, No. CIV.A. H-02-0438, 2006 WL 2850064, at *13 (S.D. Tex. Oct. 3, 2006). Several paths are available; he may show: "(1) that the allision[2] was the fault of the stationary object; (2) that the moving vessel acted with reasonable care; or (3) that the allision was an unavoidable accident." *Hatt 65, L.L.C. v. Kreitzberg*, No. 3:06CV332-MCR/EMT, 2009 WL 3163220, at *7 (N.D. Fla. Sept. 30, 2009). Toca does not contend that Knot Speed was at fault. Instead, he argues that it was already destroyed at the time of the collision, and even if it weren't, the collision was ultimately an unavoidable accident caused by an act of God.

Let's begin with the first argument—that Toca is entitled to summary judgment because the collision did not cause Knot Speed to sink. (Doc. 72 at 19.) According to Toca, "every eyewitness who was present during the height of the storm ha[s] testified that the Knot Speed was obviously badly damaged

---

[2] In maritime law, an allision refers to the striking of a moving vessel against a stationary object

14

and had taken on water before the Madame Musique even broke free." (*Id.* at 21.) But that's not true.

To start, it's a bit of a stretch to call Madame Musique's crew "eyewitnesses." They were at the marina but apparently did not witness the collision or see Knot Speed sunk. (*See* Doc. 72-2 at 30:25- 31:10; Doc. 72-5 at 35:4-25.) They were, understandably, concerned with their own predicament. As Tristian Long put it, he "didn't pay a whole lot of attention" to Knot Speed that night, since he had "bigger things to worry about." (Doc. 72-5 at 76:23-25.) And Robert Burich similarly testified that his primary focus was surviving; he "didn't really care what happened to" either ship. (Doc. 72-4 at 49:14-18, 61:16-23.)

These "eyewitnesses" believe Knot Speed sank before the collision based on how it sits in a series of photographs. They *assume* the ship suffered damage below the waterline, causing it to take on water. (*See* Doc. 72-2 at 40:3-41:7, 43:10-16, 51:19-52:4; Doc. 72-4 at 42:4-43:15, 52:10-19, 62:11-19, 65:2-13; Doc. 72-5 at 35:4-25.) For example, Burich and Long each admit they don't know whether Knot Speed had been impaled *before* the collision. (*See* Doc. 72-4 at 61:16-22, 65:2-13.) Burich also confesses he has no idea whether Knot Speed was salvageable before the collision. (*See* Doc. 72-4 at 66:16-71:22; 74:4-12.)

More to the point, Winchester witnessed the collision, and he did not say that "Knot Speed was obviously badly damaged and had taken on water before

the Madame Musique even broke free." (Doc. 72 at 21.) To the contrary, he testified that Knot Speed had suffered no notable, let alone catastrophic, damage. (Doc. 72-7 at 53:15-54:18.) While he couldn't say for certain whether it had begun to sink before the collision, (*id*. at 54:25-55:5), he did observe Knot Speed "floating okay" and "rocking back and forth" in the surf—suggesting it was still buoyant—when Madame Musique began roaming the marina, (*id*. at 25:18-26:12, 33:21-34:2). Winchester watched as Madame Musique "smashed" Knot Speed against the pilings lining its slip for several hours. (*Id*. at 27:22-25, 28:9-18, 46:19-21.)

Winchester's testimony is enough to create a genuine issue of material fact as to whether Madame Musique caused Knot Speed to suffer actionable damage. *See Do*, 2019 WL 331295, at *2. But that's not the only evidence undercutting Toca's position. "It is settled law in the Eleventh Circuit that an expert report can be used to create a genuine issue of material fact that precludes summary judgment." *In re Advanced Telecomm. Network, Inc.*, No. 618CV1186ORL28GJK, 2018 WL 4627669, at *4 (M.D. Fla. Sept. 26, 2018). Here, Zeitler inspected Knot Speed and the Yacht Basin, reviewed the documentary evidence, and concluded that "[t]he force of the impact combined with the prevailing winds and storm surge pressed MADAME MUSIQUE against the KNOT SPEED causing the KNOT SPEED to heel over to starboard resting upon the tops of multiple wood pilings," penetrating its hull and

16

"allowing water to enter" and "partially sink" the vessel. (Doc. 73-1 at 9.) He reaffirmed this opinion in his rebuttal report and further explained why, in his view, Toca's theory of the case is implausible. (*See* Doc. 73-2 at 6, 10.)

Toca seems to acknowledge that Zeitler's report creates a genuine issue of material fact, thus precluding summary judgment. (*See* Doc. 72 at 22.) So he asks the Court to ignore the opinions expressed therein for the same reasons as in his *Daubert* motion. (*Id.*) That's not something the Court can (or will) do. While a party may "challenge the admissibility of an expert's report," as Toca did, "it may not, on a motion for summary judgment, ask a court to evaluate the expert's credibility or ignore the expert's evidence altogether." *Advanced Telecomm. Network, Inc.*, 2018 WL 4627669, at *4. Since Toca's *Daubert* motion failed to show that Zeitler's methodology was untrustworthy, the Court won't ignore his opinions here. Zeitler's report creates further issues of material fact related to the cause of Knot Speed's sinking.

That brings us to Toca's fallback position—Hurricane Ian, rather than the crew's negligence, caused Knot Speed to sink. (*See* Doc. 72 at 22-25.) We start with the presumption that Madame Musique was at fault. *See Fischer*, 508 F.3d at 593. Toca believes he can overcome this presumption because he and the crew acted with reasonable care. The appropriate standard of care "is based upon (1) general concepts of prudent seamanship and reasonable care; (2) statutory and regulatory rules[;] and (3) recognized customs and usages."

17

*Fischer*, 508 F.3d at 594. "This is commonly understood to be reasonable care under the circumstances." *Hatt 65, L.L.C.*, 2009 WL 3163220, at *7. In preparing a vessel for a hurricane, the question is "whether the owner used all reasonable means and took proper action to guard against, prevent or mitigate the dangers posed by the hurricane." *Id*.

Toca claims his crew initially acted with reasonable care because "Ian was not projected to hit [Fort] Myers." (*See* Doc. 72 at 23.) Thus, trapped between a Category 4 storm and an unattended railroad bridge, they "made the best choice they could" when they selected "the only safe, available slip" in the Fort Myers Yacht Basin. (*See id*. at 14, 23-24.) But that's not how Zeitler sees it. Citing the Coast Guard's planning guidelines and state emergency warnings, he believes Toca and his crew waited too long to move inland. (Doc. 73-1 at 8.) According to Zeitler, "any prudent mariner" should have known that railroad bridges, such as the one the crew encountered, would be secured downward as Ian approached. (*Id*.) So, it's safe to say that Zeitler does not believe Toca or his crew acted with reasonable care as they began their voyage. This creates a material issue of fact concerning liability.

How about once the crew found their path blocked? Again, Zeitler does not believe Toca or the crew acted with reasonable care when they moored on B dock. He opines that "[a] knowledgeable owner/operator" would not have selected that location, since its pilings were too short to "keep the vessel from

18

shifting on top of the dock during the storm." (*Id.* at 8.) And that's not its only drawback. As Hobson explained, the dock is more "exposed to the river" than the others in the yacht basin, and its configuration severely limits how ships can secure themselves. (Doc. 72-6 at 31:21-25.)

While one may expect Hobson and Zeitler to question the crew's decision to moor on B dock, they're not alone. Although Captain Tamm was happy with the location, describing it as "a really good," "strong" dock abutting "a safe harbor," (Doc. 72-2 at 63:23-65:1), the dockmaster would not have recommended Madame Musique moor there, calling it "a vulnerable and dangerous location" to ride out a hurricane. (Doc. 74-15.) Even Toca admits that it "would not have been [his] first choice." (Doc. 72-1 at 15:21-23.)

Similar disputes of material fact are present when considering whether Toca and his crew acted reasonably in securing Madame Musique to B dock. Of course, Toca believes it was reasonable to tie the ship using two lines from the front, two from the middle, and one from the rear, but Zeitler does not agree. (Doc. 73-2 at 9.) According to him, the crew should have secured Madame Musique with:

> [A]t least one (preferably two) anchors on the opposite side of the boat from the dock so that they can be used to prevent the boat from being driven on top of the dock and [they should have] arrange[d] the boat's mooring lines leading from the boat's cleats to the dock . . . with the eye over the cleats/bitts on the dock if the[y] [] plan[ed] to remain onboard.

19

(*Id.*) But neither of these things were done.

At bottom, there is conflicting evidence concerning the timeliness of Madame Musique's departure, the prudence of Toca's decision to moor on B dock, the adequacy of his ship's moorings, and the role the ship played in the sinking of Knot Speed. As a result, Toca has not satisfied his burden in moving for summary judgment—he has not identified a lack of genuinely disputed material fact as to the cause of Knot Speed's sinking. *Desai*, 400 F. Supp. 3d at 1287. That dooms his motion, since the Court cannot weigh conflicting evidence at this stage. *Anderson*, 477 U.S. at 249.

Accordingly, it is now **ORDERED**:

1. Toca's Motion for Summary Judgment (Doc. 72) is **DENIED**;

2. Toca's *Daubert* Motion in Limine to Exclude the Expert Testimony of George M. Zeitler (Doc. 73) is **DENIED**;

3. Toca's Motion for Leave to File Reply in Support of *Daubert* Motion (Doc. 78) is **DENIED AS MOOT**; and

4. Claimants' Motion For Leave to File Amended Response to Summary Judgment (Doc. 80) is **DENIED AS MOOT**.

**ENTERED** in Fort Myers, Florida on July 28, 2025.

Kyle C. Dudek
United States Magistrate Judge